IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PITTSBURGH MACK SALES & | ) | |
| SERVICE, INC., d/b/a/ PITTSBURGH | ) | |
| TRUCK CENTER, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-0092 |
| | ) | Judge Gary L. Lancaster |
| INTERNATIONAL UNION OF | ) | Magistrate Judge Lisa Pupo Lenihan |
| OPERATING ENGINEERS, LOCAL | ) | |
| UNION NO. 66, | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

### I. RECOMMENDATION

It is respectfully recommended that the Defendant's Motion to Dismiss Plaintiff's Complaint be granted.

### II. REPORT

This is an action for declaratory judgment brought by Plaintiff Pittsburgh Mack Sales & Service, Inc. (the "Employer") against Defendant International Union of Operating Engineers

Local Union No. 66 (the "Union"). The Complaint asserts that the Union is contractually obligated, by the terms of its collective bargaining agreements (the "CBAs"), to "indemnify or otherwise hold [Employer] harmless" for additional payments due to its employees' multiemployer pension fund as a result of the Employer's withdrawal therefrom. See Complaint for Declaratory Judgment at 1.

The Union maintains that this action should be dismissed because (a) the claim is not ripe because the Employer has not made any payment to the pension fund; (b) the Union's obligations under the relevant language of the CBAs, if any, did not survive termination of those agreements; (c) contractual assumption by the employees of an employer's responsibility for withdrawal liability under the Multiemployer Pension Plan Amendments Act, 29 U.S.C. § 1381 et seq. (the "MPPAA") is unenforceable by virtue of preemption by the provisions and/or public policy purposes of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA"), of which the MPPAA is a part;[1] and (d) the indemnification language of the CBAs is insufficiently unambiguous to shift the burden of Employer's own liability to the Operating Engineers Construction Industry & Miscellaneous Pension Fund (the "Multiemployer Pension Fund" or "Pension Fund").[2]

---

1. See, e.g., Brief in Support of Motion to Dismiss at 10 (asserting that requiring the Union to assume the Employer's withdrawal liability, which liability would necessarily be paid from union dues and/or additional employee assessment(s), would "run afoul" of the public policies legislated in ERISA/MPPAA, i.e., discouraging employers from leaving underfunded pension plans and instead requiring them to pay their fair share).

2. Multiemployer pension funds are generally utilized in industries comprised of many small employers and a trained/skilled labor force. By both (a) enabling employees within the union and/or industry to continue securing retirement benefits despite inter-industry shifts in employers, and (b) enabling employers to offer a pension program with advantageous cost and risk-sharing

(continued...)

Plaintiff Employer's position is, in essence, that the Union voluntarily assumed the Employer's withdrawal liability to the Pension Fund and, upon Employer's proposed asset sale to Allentown Mack Sales & Service, Inc. ("Allentown Mack" or the "Asset Purchaser"), voluntarily negotiated a new collective bargaining agreement with the Asset Purchaser which no longer entitled the employees to Pension Fund contributions.[3]

Because Plaintiff Employer cannot maintain a declaratory judgment action for indemnification by its employees of its withdrawal liability to the Pension Fund under the provisions of its CBAs, Defendant's Motion to Dismiss should be granted. Even if the employees' assumption of the Employer's liability for Congressionally-mandated pension withdrawal contributions (amounting to a waiver of the Employer's liability) were not preempted by the public policy legislation of ERISA and the MPPAA, as this Report concludes it to be, the

---

2. (...continued)
mechanisms, such plans are mutually advantageous.  See Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California, 508 U.S. 602, 605-06 (1993).  Generally, employees may compile service credits with participating employers, obtaining vested benefit rights after a certain number of continuous years of credit.  Id.  Such plans are typically administered jointly by representatives of labor and management.  Id. at 612. Benefit levels are generally established by plan trustees based on a projection of promised employer contributions and benefit costs.

3. See Plaintiff's Brief in Opposition to Motion to Dismiss at 3-4 (asserting, *e.g.*, that Union "freely acquiesced in and enabled the asset sale" because it "could have insisted that any potential buyers . . . be bound by the terms of the Labor Agreements"); id. at 11 (reiterating that "the Union voluntarily replaced its collective bargaining agreement with [Employer]") (emphasis in original); id. at 17-19.  Cf. Plaintiff's Surreply in Opposition to Motion to Dismiss ("As [Employer] has already soundly rebutted the factual and legal bases for [Defendant's] arguments, it will avoid duplicity . . . .").

substantial social and economic concerns underpinning, and express purposes reflected in, federal pension law would certainly require, at a minimum, a *clearly knowing* waiver by the employees and/or assumption by their Union of this federally-protected pension contribution right.

A. **Statement of Facts**

This is a declaratory judgment action for indemnification by the Union (and thus by its member employees) of the Employer's withdrawal liability to the employees' Pension Fund, premised on the provisions of the CBAs.

Employer Pittsburgh Mack Sales & Service was engaged in the business of selling and servicing Mack Trucks. Employer and the Union entered into two collective bargaining agreements, each effective January 13, 2004 through January 12, 2007, covering (a) journeymen mechanics, mechanics, body men and apprentices; and (b) parts and building maintenance employees at Employer's Pittsburgh, Pennsylvania facility. These CBAs contained identical provisions requiring that, as part of the employees' compensation package, the Employer contribute $1.65 per man-hour to the employees' Pension Fund. More specifically, the CBAs provided that:

> During the term of this Agreement, the employer agrees to contribute to [the Multiemployer Pension Fund] for each man hour . . . $1.65

> The Union will hold [Employer] harmless for any liability to the Fund for any amounts claimed over and above this hourly contribution.

See Complaint at ¶ 8 and Exhibits thereto.

During the second year of the three-year employment agreements, Employer executed a Letter of Intent to sell substantially all of its assets to Allentown Mack for $1,625,000. Under the October 5, 2005 Letter of Intent, the asset sale was contingent on a "successful meeting" and letter of understanding between Allentown Mack and the Union with regard to post-closing employment terms.[4] The effective date of the related Asset Purchase Agreement was December 19, 2005. The Union, facing  - as a result of Employer's asset-sale withdrawal from business - the potential loss of all its jobs at Employer's facility, entered into a new employment agreement with Allentown Mack on October 18, 2005.[5] As conditioned in the Letter of Intent between Employer and Allentown Mack, the new employment agreement eliminated hourly contributions to the Pension Fund on behalf of the employees.

---

4. See Plaintiff's Brief in Opposition to Motion to Dismiss at 6 (explaining that Allentown Mack agreed to an asset purchase "provided that [it] could reach agreement with the Union regarding ongoing terms and conditions of employment for the bargaining unit employees"). More particularly, the Letter of Intent required, as a condition of sale, the Union's agreement that Allentown Mack would not be bound by the Pension Fund provisions of the existing CBAs. See Defendant's Reply Brief in Support of Motion to Dismiss at 2.

5. Compare Plaintiff's Brief in Opposition to Motion to Dismiss at 3 (noting that the CBAs contained a "successor clause" providing that the employment agreement would be binding upon an entity which purchased the *company*). Potential employers subject to similar job-and-benefit-protective provisions of collective bargaining agreements often structure their business transactions as asset sales.

By letter of November 20, 2006, the Multiemployer Pension Fund made a demand on Employer for withdrawal liability in the amount of $413,389 plus interest, for funding of the employee's vested benefits through December 31, 2005 (the date of Employer's withdrawal from the Fund). See Complaint at ¶ 13. The Union has refused Employer's subsequent demand for indemnification under the CBAs. Id. at ¶¶ 15-16.

B. **Standard on Motion to Dismiss**

A motion to dismiss is an appropriate means of challenging the legal sufficiency of the Complaint. See, *e.g.*, Sturm v. Clark, 835 F.2d 1009, 111 (3d Cir. 1987). It should be granted where the Complaint fails to set forth facts stating a claim to relief that is plausible on its face. Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955 (May 21, 2007). In considering a motion to dismiss, the Court accepts as true the factual allegations and draws reasonable inferences in favor of the non-moving party. Cruz v. Beto, 405 U.S. 319, 322 (1972); Carino v. Stefan, 376 F.3d 156, 159 (3d Cir. 2004). It may address documents attached to or referenced in the Complaint and those attached as exhibits to the motion to dismiss if they are integral to plaintiff's claims. See Pension Benefit Guaranty v. White Consolidated Industs., 998 F.2d 1192, 1196 (3d Cir. 1993); In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).

C. **ERISA and the MPPAA**

The Employment Retirement Income Security Act ("ERISA"), enacted in 1974, was intended, as its title suggests, "to provide comprehensive regulation for private pension plans"

and to "prescribe standards for the funding, management and benefit provisions of these plans" as well as to establish a system of pension benefit insurance via the Pension Benefit Guaranty Corporation (the "PBGC"). Connolly v. Pension Benefit Guaranty Corporation, 475 U.S. 211 (1986). The legislation was enacted to "ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans" and to guarantee that if a worker "has fulfilled whatever conditions are required to obtain a vested benefit - he will actually receive it." Id. at 214 (quoting Nachman Corp. v. Pension Benefit Guaranty Corp., 446 U.S. 358, 361-62 (1980)) (citations omitted); Concrete Pipe, 508 U.S. at 607 (same).

Under ERISA, all contributors to covered multiemployer plans were assessed insurance premiums payable to the PBGC and, if the PBGC paid guaranteed benefits upon a plan's termination, all employers that had contributed to the plan during the preceding five (5) years were liable to the PBGC in amounts proportional to their shares of the plan's contributions during that period, subject to a cap at 30% of the individual employer's net worth.

Problems arose, however, with respect to multiemployer plans because, particularly in declining industries, employer withdrawal (without consequence), shifted responsibility for any unfunded vested benefits for past service liabilities to the remaining employers, encouraging additional withdrawals, and causing a vicious downward spiral in many multiemployer plans. See 475 U.S. at 216; see also Concrete Pipe, 508 U.S. at 608 (observing that, before enactment of the MPPAA, the possibility of liability upon plan termination "created an incentive for employers to withdraw from weak multiemployer plans").

The Multiemployer Pension Plan Amendments Act of 1980 was, therefore, an amendment to ERISA expressly intended to ensure that employers electing to withdraw from multiemployer pension plans would not leave vested pension benefits only partially funded, thus threatening the solvency of such plans. In particular, the Act provides that "[i]f an employer withdraws from a multiemployer plan . . ., then *the employer* is liable to the plan in an amount determined . . . to be the withdrawal liability." 29 U.S.C. § 1381(a) (emphasis added).[6] The provision was specifically intended to require a withdrawing employer "to pay whatever share of the plan's unfunded liabilities was attributable to that employer's participation", *i.e.*, to "require [a withdrawing employer] *to complete funding* its fair share of the plan's unfunded liabilities." 472 U.S. at 216 (quoting Pension Benefit Guaranty Corp. v. R.A. Gray & Co., 467 U.S. 717 (1984)) (emphasis added); 508 U.S. at 608 (same); Pension Plan Termination Insurance Issues: Hearings before the Subcommittee on Oversight of the House Committee on Ways and Means, 95th Cong., 2d Sess., 22 (1978).

The withdrawal liability is "calculated as the difference between the present value of the vested benefits and the current value of the plan's assets." Id. at 217 (quoting Gray, 467 U.S. at 725). Such liability is calculated by the plan's actuary using assumptions covering, *e.g.* employee mortality, likelihood of benefits vesting, and future rates of interest and growth in wages; it

---

6. See also  Brief in Opposition to Motion to Dismiss at 5, n.2 ("The MPPAA is a part of ERISA and provides that when an employer withdraws from a multi-employer pension plan, the employer becomes liable for its proportionate share of the plan's unfunded vested liability.") (citing Bd. of Trustees v. Thompson Building Materials, Inc., 749 F.2d 1396, 1401-02 (9th Cir. 1984)); Connors v. B&W Coal Co., 646 F.Supp. 164, 169 (D.D.C. 1986) (noting that "withdrawal liability is a statutory obligation" imposed "on signatory *employers*" and rejecting claim against party alleged to have assumed contribution obligations on employer's behalf) (emphasis in original).

entails reducing future cash flows to present values.  See Concrete Pipe, 508 U.S. at 610 (citing 29 U.S.C. § 1393).[7]  The MPPAA extends liability for the withdrawal assessment to the employer and other members of any commonly controlled group.

Several sections of the MPPAA, however, moderate the impact of withdrawal liability by, *e.g.*, exempting certain transactions.  For example, 29 U.S.C. § 1384 provides an exemption from withdrawal liability where the employer and asset purchaser structure their transaction to include *continuing payments* to the multiemployer fund in accordance with the employer's commitment under the collective bargaining agreement (rather than effecting a termination of employer contributions).[8]

---

7.  Cf. Concrete Pipe, 508 U.S. at 638 (explaining that multiemployer plans "operate by pooling contributions and liabilities" and that an imposition of withdrawal liability is properly "based on the proportion of the plan's contributions (and coincident service credits) provided by the employer during [its] participation in the plan"); id. (further explaining that, given the risk-spreading nature of such plans, the participating employer accepts the possibility that "its employees will vest at a rate above the average for all employees of contributing employers [in which event] it will pay less than it would have by creating a single-employer plan" or that "circumstances may produce the opposite result"); id. at 639 (observing that the MPPAA "spreads the unfunded vested liability among employers in approximately the same manner the cost would have been spread if all of the employers participating at the time of withdrawal had seen the venture through" and that withdrawal liability is therefore "consistent with the risks assumed").

8.  See generally Bay Area Laundry and Dry Cleaning Pens. Trust Fund v. Febar Corp., 522 U.S. 192 (1997) ("Instead of prohibiting employers from leaving their plans, Congress imposed a scheme of mandatory payments designed to discourage withdrawals *ex ante* and cushioning their impact  *ex post*."); United Retail and Wholesale Employees Teamsters Union Local 115 Pension Plan v. Yahn & McDonnell, Inc., 787 F.2d 128, 130 (3d Cir. 1986) (stating *dual purpose* of the MPPAA as "to discourage withdrawals from multiemployer pension plans and to insure the solvency of such plans"), *aff'd sub nom*, PBGC v. Yahn & McDonnell, Inc., 481 U.S. 735 (1987).

**D.   Analysis**

**1.   Employer's Interpretation of the CBA Language is Preempted Under ERISA and the MPPAA**

Defendant maintains that Plaintiff's claim is preempted by ERISA because it is a "comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans" and Congress clearly intended it to occupy the field.  Brief in Support of Motion to Dismiss at 6-8 (quoting Shaw v. Delta Air Lines, 463 U.S. 85, 90 (1983)).  Cf. id. (citing United Steelworkers of America v. United Engineering, Inc., 52 F.3d 1386 (6th Cir. 1995) (holding that union's breach of contract claim against employer for benefits lost on employer's distress termination of pension plan - where employment agreement expressly provided for full benefits even if employer terminated plan - was preempted)).

This Report finds, however, that the Employer's proposed interpretation of the CBA language at issue is more clearly preempted by two Supreme Court cases not cited in either party's pleadings:

More particularly, in Connolly v. Pension Benefit Guaranty Corporation, 475 U.S. 211 (1986), the Supreme Court expressly held that application of a regulatory statute otherwise within the powers of Congress may not be defeated by private contractual provisions.  It affirmed, therefore, the constitutionality of the withdrawal liability provisions of the MPPAA, despite such provisions' nullification of contractual limitations on the employer's pension fund liabilities.[9]

---

9.   See Connolly, 475 U.S. at 222-25 (holding that provisions of trust agreement and pension plan, limiting employer's sole obligation to the payment of hourly-rate contributions required by the collective bargaining agreements, and ending liability when such contributions were paid, were nullified by the MPPAA).  Cf. id. at 220 n. 6 (noting that every court to have considered the
(continued...)

Indeed, the unanimous Court observed that the employer's objections "gain[ed] nothing from the fact that [the employer] was protected by the terms of its contract from any liability beyond the specified contributions to which it had agreed" for "[c]ontracts, however, express, cannot fetter the constitutional authority of Congress"; rather, "when contracts deal with a subject matter which lies within the control of Congress, they have a congenital infirmity. Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them." Connolly, 475 U.S. at 223-24 (quoting Norman v. Baltimore & Ohio R. Co., 294 U.S. 240, 307-08 (1935)). See also id. at 224 (concluding that Congress had justly "nullified contractual provisions limiting liability by imposing an additional obligation otherwise within its power to impose, *i.e.*, statutory withdrawal liability redounding to the benefit of pension trusts);[10] id. at 225 (observing that the Act's "safeguard[ing] of participants in multiemployer pension plans by requiring a withdrawing employer to fund its share of the plan obligations incurred during its association with the plan" and the resulting "interference with the property rights of an employer, arises from a public program that adjusts the benefits and burdens of economic life to promote the common good").[11]

---

9. (...continued)
constitutionality of the MPPAA had upheld it against, *e.g.*, assertions of due process and/or takings clause violations).

10. Id. ("If the regulatory statute is otherwise within the powers of Congress . . . its application may not be defeated by private contractual provisions.").

11. See also Peick v. Pension Benefit Guaranty Corp., 724 F.2d 1247 (7th Cir. 1983) (noting that "Congress has the primary task of equitably distributing the burden of underfunded pensions" and rejecting constitutional challenges to MPPAA's imposition of burden on employers).

The Supreme Court reiterated and reaffirmed these holdings seven years later in <u>Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California</u>, 508 U.S. 602 (1993). Specifically, the Supreme Court again held, in the face of renewed Constitutional challenges to the MPPAA, that it could not be defeated by "private contractual provisions" such as those protecting an employer from liability beyond what was specified in its collective bargaining and trust agreements. 508 U.S. at 640-43 (quoting <u>Connolly</u>, *supra*).[12]

The Third Circuit and our sister Courts have repeatedly noted the constitutionality of the MPPAA's abrogation of contractual provisions intended to limit an employer's withdrawal liability. See, *e.g.*, <u>Terson Co., Inc. v. Bakery Drivers and Salesmen Local 194</u>, 739 F.2d 118 (3d Cir. 1984) (holding that withdrawal liability provisions were rational means of insuring that each member of multiemployer plan shouldered its portion of collective burden imposed to safeguard employees' right to full compensation); <u>Warner-Lambert Co, Inc. v. United Retail and Wholesale Employee's Teamster Local No. 115 Pension Plan</u>, 791 F.2d 283, 285-86 (3d Cir. 1986) (noting authority rejecting employer's assertion that MPPAA worked unconstitutional abrogation of limits to liability set by collective bargaining agreement); <u>Teamsters Pension Trust Fund of Phila. v. Domenic Cristinzio, Inc.</u>, 994 F.Supp. 617 (E.D. Pa. 1998) (granting fund's motion for summary judgment re statutory withdrawal liability despite collective bargaining agreements

---

12. See also <u>id.</u> (concluding that the contractual conditions of its Master Labor Agreement, limiting liability "exclusively to payment of the contributions specified from time to time in collective bargaining agreements", did not give employer a reasonable expectation that it would not be faced with liability for promised benefits under pension plan long subject to federal regulation); <u>id.</u> at 646 (rejecting argument that imposition of liability "ignore[d] express and bargained-for conditions on [its contractual] promises" where employer voluntarily participated in plan subject to federal regulation).

expressly limiting employer's obligation to fixed fund contributions); Lyons v. Raymond Rosen & Co., Inc., 1994 WL 129955, *12 (E.D. Pa. April 12, 1994) (noting that arguments that a collective bargaining agreement limited employer's liability to its hourly contributions were expressly rejected in Concrete Pipe).[13]

In sum, the Supreme Court has held that withdrawal liability under the MPPAA, which has the express *purpose* of imposing on an employer its share of responsibility for unfunded vested benefits, is imposed upon the employer as a condition of its participation in a federally-regulated multiemployer pension plan and cannot be defeated by private contractual provisions. See discussion, *supra*; cf. also Republic Industries, Inc. v. Teamsters Joint Council No. 83 of Virginia Pension Fund, 718 F.2d 628, 632 (4th Cir. 1983) (stating that the "basic concept" of the MPPAA "is that each employer, in addition to contributions to the plan pursuant to collective bargaining agreements, owes a share of the unfunded vested liability of the plan to its beneficiaries and the employer must pay that share if he withdraws from the plan even if the plan does not terminate").

Plaintiff's requests in this action are tantamount to an attempt to defeat Congressional purpose because the interpretation of the indemnification language it urges would transfer an obligation expressly imposed upon the employer onto the very employees/pension plan

---

13. And, as this Court has observed, the MPPAA has specific provisions directed at preventing an employer's attempts to evade or avoid withdrawal liability through, *e.g.*, changes in identity, form or control, or through less-than-arm's-length transactions. See, *e.g.*, Supervalu, Inc. v. Bd. of Trustees of the Southwestern Pennsylvania and Western Maryland Area Teamsters & Employers Pension Fund, 442 F.Supp. 252 (W.D. Pa. 2006). Cf. Cristinzio, 944 F.Supp. at 619 n. 2 ("MPPAA explicitly provides that any transaction designed to "evade or avoid" withdrawal liability should be ignored.") (citing 29 U.S.C. § 1392(c)).

beneficiaries the MPPAA was enacted to protect.[14] The legislative purposes clearly articulated in federal pension law, and recognized in broad pronouncements of the Supreme Court, cannot be so thwarted. Rather, Plaintiff's interpretation is precluded as indistinguishable in effect from other attempted limitations on withdrawal liability, which have been repeatedly held to be ineffective. See discussion, *supra*.

Thus, even if the Employer had obtained an *express* agreement from the Union to take on itself, and by extension on its members, an obligation to make up to the Pension Fund any current asset-vested benefit deficit assessed against the Employer as a result of the Employer's unilateral decision to abandon the collective bargaining agreement, this Report concludes that such agreement would clearly be unenforceable as contrary to the public policy manifested in ERISA

---

14. See Connolly, 475 U.S. at 227 (explaining that the "plain . . . purpose of imposing withdrawal liability was to ensure that employees would receive the benefits promised them"); Concrete Pipe, *supra* (reiterating that "primary congressional objective" of MPPAA was to "protect[] covered employees and beneficiaries of pension trusts"). Cf. 70 Corpus Juris Secundum Pensions § 180 (June 2007) ("The MPPAA is a remedial statute, which should be liberally construed in favor of protecting the participants in employee benefit plans.") (citing Board of Trustees of Trucking Employees of North Jersey Welfare Fund, Inc. v. Centra, 983 F.2d 495 (3d Cir. 1992)); 29 U.S.C. § 1001 (1988) (Congressional Findings and Declaration of Policy) (stating that Congress enacted ERISA to safeguard the "continued well-being and security of millions of employees and their dependents" covered by private pension plans).

See also Republic Industries,, 718 F.2d at 639 (Fourth Circuit's holding that Congress's requirement that "employers who received the full benefit of employees' services bear the cost" of unfunded pension liability, "*rather than the employees* who provided their services on the actual or implied promise that they would ultimately enjoy their vested, accrued pension benefits" was equitable and rational response to problem of how to protect financial stability of multiemployer pension funds) (emphasis added).

That the asserted contract interpretation seeks to transfer liability to the Union/employees is one of several basis for distinguishing this case from Vare v. Philadelphia Elec. Co., 1994 WL 8144 (E.D. Pa. Jan. 12, 1994) (cited in Plaintiff's Brief in Opposition at 9). See Defendant's Reply Brief in Support at 8-9.

14

and the MPPAA.[15] As noted above, the alleged purpose of the CBA provisions at issue, *i.e.*, requesting the Union/the employees to indemnify the Employer for its share of any underfunding of vested benefits, amounts to an attempt to obtain a waiver of a Congressionally-mandated responsibility. This the Employer may not do.[16] A potential retirement benefit loss - precipitated by an Employer electing early withdrawal from a multiemployer plan without making provision for a continuation of contributions (by, *e.g.*, the asset purchaser) - may not be transferred by private contract from the Employer (upon whom Congress has decreed the responsibility should rest) to the employees (for whose protection the legislation was enacted).[17]

---

15. See generally Service Employees International Union Local 36 v. City Cleaning Co., Inc., 982 F.2d 89 (3d Cir. 1992) (observing that "a court may not enforce a collective bargaining agreement that is contrary to public policy").

16. Cf. S&M Paving, Inc. v. Construction Laborers Pension Trust of Southern California, 539 F.Supp. 867 (D.C. Cal. 1982) (noting that employer could not "argue that the collective bargaining agreement defined or could limit [employers'] entire obligation to the Trust" as Connolly held that "liability under the plan had to be defined by reference to the appropriate ERISA statutes, and not solely by the [cba]" and that "parties could not shield themselves from a statutory obligation simply by putting what amounted to disclaimer clauses in their contractual agreement").

   Compare Plaintiff's Brief in Opposition at 11, 13 (asserting that employees would not be "receiving less than the law" requires and that no offense to public policy occurs where employees "indirectly pay the indemnification amount [but ultimately] benefit in the form of [receipt of their] pension benefits").

17.   Cf.  Local 1035, Internat'l Brotherhd. of Teamsters v. Pepsi Allied Bottlers, Inc., 99 F.Supp.2d 219 (D.C. Conn. 2000) (holding that union's collective bargaining agreement indemnification of employer's FLSA overtime liability violated that statute's public policy because enforcement would result in employees funding their own overtime); id. (concluding that union could not "bargain[] away employee's rights granted to them under" statute enacted to provide guaranteed standard); Stamford Bd. of Educ. v. Stamford Educ. Assoc., 697 F.2d 70 (2d Cir. 1982) (holding that collective bargaining agreement indemnification for sexual discrimination violated federal civil rights policy and was void); id. at 73 (noting that enforcement of the "hold harmless" provision would remove incentive legislation intended to

(continued...)

### 3. Clear and Unambiguous Waiver/Assumption; Contractual Infirmities

Although this Report concludes that even an express indemnification/waiver by the Union of the Employer's MPPAA withdrawal liability would be nullified by the public policies legislated under ERISA and the MPPAA, it further notes that the CBA provisions at issue contain no such express waiver but are ambiguous.

Employer and/or its legal counsel was, or certainly should have been, fully cognizant of its potential federally-mandated liability in the event it elected to terminate participation in the Multiemployer Pension Plan.[18]  If it intended to obtain a waiver by the employees/an assumption by the Union of the employees' rights to fully-funded benefits through the date of the Employer's elective termination, it could have.  It did not.  To the contrary, the CBA language contains only an ambiguous indemnification protecting the Employer from liability for "amounts claimed over and above this hourly contribution."  Such language may be read as, *e.g.*, intended to protect the Employer from a subsequent assertion by the Union or the Pension Fund that the hourly contribution was to be something other than the specified $1.65.  See *supra* (quoting CBAs).  But preemption aside, this language cannot be read as releasing the Employer from the MPPAA

---

17. (...continued)
create, and would probably require union dues to be utilized to satisfy a discrimination judgment against the employer); id. (concluding that "courts must not be timid in voiding agreements which tend to injure the public good or contravene some established interest of society").

18. Cf. Plaintiff's Brief in Opposition to Motion to Dismiss at 4 (asserting that Union, at time of new agreement with Allentown Mack, would have known that sale could trigger Pittsburgh Mack's withdrawal liability).

vested-benefit pension obligations occasioned by its own elective, early withdrawal from the Multiemployer Pension Fund and shifting such obligations to the shoulders of its employees.

Employer, in asserting that the provisions at issue were intended to indemnify it against withdrawal liability, asserts that the contract language encompassed indemnification for something within its control.  Such language must be strictly construed.  See Jacobs Constructors, Inc. v. NPS Energy Services, Inc., 264 F.3d 365, 371-73 (3d Cir. 2001) (predicting that Pennsylvania Supreme Court would conclude that indemnification for breach of a contractual liability to another, raising the same concerns as an indemnification for one's own negligence, must therefore "be stated plainly, in clear and unequivocal language"); id. (observing that indemnification of a "contractual liability to a third party", imposing "an obligation, regardless of the fault of the indemnitor", the extent of which is "uncertain and indefinite, and entirely in the hands of [the indemnitee]" imposes an "unusual and extraordinary obligation in the same manner as indemnification for one's own negligence").  See also Foreman v. Exxon Corp., 770 F.2d 490 (5th Cir. 1985).

It is a well-established principle that an indemnity clause is to be construed against the party seeking indemnification.  And the Third Circuit has observed that both (a) the requirement of clear, unambiguous language, and (b) the imposition of narrow interpretation, are appropriate to agreements intended to affect a voluntary shifting of legal obligations.  See, e.g., Jacobs, 264 F.3d at 372-73.

In this case, it is not clear that the Employer has paid any money; the Complaint does not so allege, and the parties' briefing contains an undenied allegation that payment on the underlying claim has been made by a principle, but not by the Plaintiff. See Defendant's Reply Brief in Support at 5. It is unclear whether, under the contract language, it is sufficient that the Employer have a legal obligation, or whether it must actually pay an amount alleged due, to trigger the indemnity clause. Moreover, it is unclear that the asserted indemnification for amounts "over and above" the rate contracted for the three-year term of the CBA encompasses withdrawal liability. See, *e.g.*, Republic Industries, Inc. v. Central Pennsylvania Teamsters Pension Fund, 693 F.2d 290, 292 (3d Cir. 1982) (explaining that the purposes of the withdrawal liability provisions include both "remov[ing] incentives for employers to withdraw, and ensuring , "in effect, that a withdrawing employer will *continue to fund* its proportional share of plan obligations incurred during its association with the plan, rather than shift those obligations") (citing Peick, *supra*) (emphasis added); Connolly, 472 U.S. at 216 (explaining that intent of MPPAA was to require withdrawing employer "*to complete funding*" its fair share under the plan) (emphasis added); Frank Cummings, ERISA Litigation: An Overview of Major Claims and Defenses, SM10 ALI-ABA 1 (May 10, 2007) (discussing ERISA preemption and "withdrawal liability *in lieu of* ongoing contributions") (emphasis added); 29 U.S.C. § 1984 (creating safe harbor for asset sale where purchases assumes employer's pension contribution obligations under the collective bargaining agreement).

The Court need not, however, resolve these issues of strict construction, as it concludes that, as a matter of law, an employer cannot contractually transfer its withdrawal liability under

the MPPAA to the Union representing the employees on whose behalf the Congressionally-mandated assessment is made.  This employer, like those in Connolly and Concrete Pipe, voluntarily negotiated and participated in a pension plan within the strictures of ERISA.  It is fairly held to the Congressional social and economic policy legislation related thereto, including the federal apportioning of rights and responsibilities designed to ensure a degree of financial/retirement security to private industry employees and their dependents.

### III.  CONCLUSION

For the reasons aforesaid, it is recommended that the Defendant's Motion to Dismiss be granted.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrate Judges, the parties are allowed ten (10) days from the date of service to file objections to this report and recommendation.  Any party opposing the objections shall have ten (10) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

      /s/ Lisa Pupo Lenihan
LISA PUPO LENIHAN
United States Magistrate Judge

Dated: July 23, 2007

cc:  All Counsel of Record